UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW WILLKIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:24 CV 1408 CDP |
| | ) | |
| FRANK BISIGNANO, | ) | |
| | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Matthew Willkie brings this action seeking judicial review of the Commissioner's decision denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq. 42 U.S.C. § 405(g) provides for judicial review of a final decision of the Commissioner. For the reasons that follow, the decision is reversed and this case is remanded to the Commissioner with instructions to calculate and award benefits.

### Procedural History

Plaintiff was born in 1990 and alleges an onset date of August 21, 2015. His date last insured is September 30, 2021. Thus, to be entitled to benefits plaintiff

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security and is automatically substituted as defendant in this action. Fed. R. Civ. P. 25(d).

has the burden to show he was disabled between August 21, 2015, and September 30, 2021.

Plaintiff alleges he became disabled because of bipolar disorder, generalized anxiety disorder with panic, social anxiety disorder, ADHD, and migraines. (Tr. 817.) He also has autism.[2] (Tr. 1119.) He filed his application for benefits on October 11, 2016, with the assistance of a non-attorney representative. (Tr. 817.)

Plaintiff's claim was denied initially and by an ALJ on May 1, 2019 following a hearing. (Tr. 364, 269-88.) On June 8, 2020, the Appeals Council reversed and remanded the decision for additional evaluation. (Tr. 289-92.) After a supplemental hearing, the ALJ issued a second unfavorable decision dated July 30, 2021. (Tr. 295-320). On January 31, 2022, the Appeals Council again reversed and remanded the decision for additional evaluation. (Tr. 321-24.) A different ALJ issued a third unfavorable decision on November 21, 2022, following a telephonic hearing. (Tr. 327-55.) The Appeals Council remanded that decision, too, on August 18, 2023. (Tr. 357-60.) After another hearing, at which plaintiff testified, the ALJ issued a fourth unfavorable decision on May 22, 2024. (Tr. 14-47.) The Appeals Council denied plaintiff's request for review on September 4, 2024. (Tr. 1.) Plaintiff timely filed for judicial review of the Commissioner's final decision in this Court under 42 U.S.C. § 405(g). The ALJ's

---

[2] His autism spectrum disorder was formerly known as Asperger's Syndrome. (Tr. 1119.)

fourth decision dated May 22, 2024, is now the final decision of the Commissioner.  42 U.S.C. § 1383(c)(3).

In this action for judicial review, plaintiff contends that his residual functional capacity (RFC) is not supported by substantial evidence and that the ALJ improperly evaluated opinion evidence.  I agree and will reverse the Commissioner's decision and remand for an award of benefits.

**Medical Records and Other Evidence Before the ALJ**

With respect to the medical records and other evidence of record, I adopt plaintiff's recitation of facts (ECF 17) as they are admitted by the Commissioner (ECF 20-1).  I also adopt the Commissioner's statement of additional material facts (ECF 20-1) as supported by the record.  Additional specific facts will be discussed as needed to address the parties' arguments, but in reaching my decision I have considered the entirety of the record, which exceeds 3500 pages.

**Discussion**

A.    <u>Legal Standard</u>

To be eligible for disability insurance benefits under the Social Security Act, plaintiff must prove that he is disabled.  *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable

3

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). At Step 1 of the process, the Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, at Step 2 the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. At Step 3, the Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At Step 4 of the process, the ALJ must assess the claimant's RFC – that is, the most the claimant is able to do despite

4

his physical and mental limitations, *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) – and determine whether the claimant is able to perform his past relevant work. *Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005) (RFC assessment occurs at fourth step of process). If the claimant is unable to perform his past work, the Commissioner continues to Step 5 and determines whether the claimant can perform other work as it exists in significant numbers in the national economy. If so, the claimant is found not disabled, and disability benefits are denied.

The claimant bears the burden through Step 4 of the analysis. If he meets this burden and shows that he is unable to perform his past relevant work, the burden shifts to the Commissioner at Step 5 to produce evidence demonstrating that the claimant has the RFC to perform other jobs in the national economy that exist in significant numbers and are consistent with his impairments and vocational factors such as age, education, and work experience. *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012). If, as here, the claimant has nonexertional limitations, the Commissioner may satisfy his burden at Step 5 through the testimony of a vocational expert. *King v. Astrue*, 564 F.3d 978, 980 (8th Cir. 2009).

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable

5

person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240

F.3d 1145, 1147 (8th Cir. 2001). "[Substantial evidence] means – and means only

– such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation

modified). Determining whether there is substantial evidence requires scrutinizing

analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007). I must consider

evidence that supports the Commissioner's decision as well as any evidence that

fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir.

2010). Where the record "overwhelmingly supports" a finding of disability,

reversal and remand for an immediate award of benefits is the appropriate remedy.

*Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009); *see also Parsons v.

Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984) ("Where further hearings would

merely delay receipt of benefits, an order granting benefits is appropriate.").

B.    ALJ's Decision

In her written decision, the ALJ found that plaintiff had not engaged in

substantial gainful activity from his alleged onset date of August 21, 2015 through

his date last insured of September 30, 2021. (Tr. 20.) The ALJ found that plaintiff

had the following severe impairments: bipolar disorder, major depressive disorder,

generalized anxiety disorder, autism spectrum disorder, attention deficit

hyperactivity disorder (ADHD), and post-traumatic stress disorder (PTSD). (Tr.

20.)  The ALJ found plaintiff had the non-severe impairments of migraines, gastrointestinal symptoms, food sensitivity, COVID-19, chronic mastoid problems, mitral valve prolapse, and chronic fatigue.  (Tr. 20-21.)  The ALJ determined that plaintiff's impairments or combination of impairments did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 21.) The ALJ found plaintiff to have the residual functional capacity (RFC) to perform light work with the following limitations:

> Occasional overhead reaching, occasional push and pull, occasional stoop, kneel, crouch, no crawling, only occasional exposure to pulmonary irritants, Code 3 or less noise environment, no unprotected height or hazardous machinery, occasional exposure to extreme temperatures and vibrations, who is able to learn remember and carry out simple routine tasks and make simple routine work related decisions, use reason and judgment to complete those tasks in a timely manner and at an appropriate pace while ignoring or avoiding distractions, have only gradual changes in job settings and duties, work close to or with others without distracting them while performing simple routine tasks, having only occasional interactions with supervisors, coworkers and no contact with the general public, can work a full day without needing more than the standard breaks.

(Tr. 23.)  The ALJ found that plaintiff was unable to perform his past relevant work as a management analyst and relied upon vocational expert testimony to support a conclusion that that there were significant jobs in the economy of router, routing clerk, and price marker that plaintiff could perform.  (Tr. 32-33.)  The ALJ therefore found plaintiff not to be disabled.  (Tr. 33.)

C.    RFC Determination

RFC is defined as "what [the claimant] can still do" despite his "physical or mental limitations."  20 C.F.R. § 404.1545(a).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016).  The ALJ must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.  *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (citing *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)).

Plaintiff first claims that his RFC is not supported by substantial evidence because the ALJ failed to properly consider the considerable amount of support he requires from his case workers when evaluating his daily functioning.

The ALJ concluded that plaintiff "lives independently and accomplishes his daily activities."  (Tr. 22.)  According to the ALJ, plaintiff is not "mentally disabled" because he "is an intelligent individual who is able to interact appropriately, think rationally, live independently, and manage his activities of daily living."  (Tr. 27.)  This conclusion is not supported by substantial evidence of record.

8

On December 2, 2015, Rolando Larice, M.D., psychiatrist, examined plaintiff and, after assessing him with anxiety, depression, impulse control disorder, and personality disorder, placed him in an intensive outpatient program (IOP) in lieu of psychiatric hospitalization.  (Tr. 1126-27.)  Plaintiff's need for this level of care was "evidenced by his inability to live independently, establish and maintain healthy relationships, manage medications, and sustain [his] activities of daily living."  (*Id.*)  Dr. Larice believed this level of care was required despite plaintiff's normal mental status examination, good intellect, judgment, and insight. (*Id.*)  Dr. Larice admitted plaintiff to IOP for a minimum of three days per week, which plaintiff attended.[3]  (*Id.*)

On September 7, 2017, William Letterman, MSW, LCSW, clinical supervisor at BJC Behavioral Health, confirmed that plaintiff needed a case manager to help him manage his daily activities.  (Tr. 1265.)   Although plaintiff

---

[3] Plaintiff had numerous IOP follow-up appointments with Dr. Larice and psychiatric mental health nurse practitioner Jessica Whelan, during which plaintiff reported side effects from his medications and displayed anxiety and depression, fair grooming and hygiene, distractible behavior, and rambling thoughts.  (Tr. 1117-18, 1120, 1102-03, 1105, 1088-89, 1090, 1083-84, 1085, 1072-75, 1063-65.)   At his December 10, 2015, IOP follow-up appointment, plaintiff's diagnoses included bipolar II disorder, autism spectrum disorder, ADHD, generalized anxiety disorder, and social anxiety.  (Tr. 1119.)  Plaintiff continued regular treatment with Nurse Whelan after release from IOP on a monthly basis until he transitioned into the regular care of Dr. Wittrock in September of 2017.  (Tr. 1150, 1251.)  Throughout treatment, Nurse Whelan assessed plaintiff as "requiring substantial support (level 2)" for his autism.  (Tr. 1197, 1201, 1163, 1174, 1178, 1181.)  This assessment did not change.

lived alone, his mother provided rental and housekeeping assistance. (*Id.*) Plaintiff reported needing help with activities of daily living because he was struggling with many areas of life. (*Id.* at 1266.) His GAF score was 47.[4] (*Id.* at 1268.) Plaintiff stated that his depression made it difficult to manage his daily activities, he could not tolerate schedule changes, his anxiety caused him to employ avoidance activities, he struggled with hygiene and self-care, he had mood issues, and his home was disorganized. (*Id.*) Based on this assessment, plaintiff was assigned a case worker to meet with him every other week to help with scheduling and self-care, assist him with meeting a vocational specialist, and develop coping skills for housekeeping and organizational skills. (*Id.* at 1269.)

Plaintiff proceeded to meet with caseworkers every other week from December 13, 2017 through at least September 17, 2020, when in-person visits were suspended due to the COVID-19 pandemic. During this time, caseworkers documented assisting plaintiff with scheduling psychiatry and therapy appointments (Tr. 1273, 1624, 1790, 1810, 1819, 1827), attending appointments

---

[4] The Global Assessment of Functioning is "a scoring system for the severity of illness in psychiatry." IH Mondrad Aas, Guidelines for Rating Global Assessment of Functioning (GAF), Nat'l Lib. of Med. (Jan. 20, 2011), https://pmc.ncbi.nlm.nih.gov/articles/PMC3036670 (last visited Sept. 22, 2025). The 41 to 50 range of the GAF is described as: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* Global Assessment of Functioning (GAF) Scale, Int'l Assoc. of Analytical Psychology, https://iaap.org/wp-content/uploads/2023/04/GAF-Scale.pdf (last visited Sept. 22, 2025).

with plaintiff (Tr. 1253, 1256, 1603), and seeking legal services (Tr. 1423.) Caseworkers also noted that plaintiff did not consistently groom himself, he was observed with long hair and a long, unkempt beard, and he did not bathe regularly or brush his teeth.  (Tr. 1270, 1400, 1423, 1439, 1601.)  Plaintiff's living space was highly disorganized and cluttered with papers, trash, water bottles, soda cans, and dirty laundry strewn about in the living room, and he continued to seek help with management of household responsibilities.  (Tr. 1270, 1400, 1407, 1423, 1461, 1571, 1572, 1578, 1584, 1589, 1601, 1623, 1794, 1826.)  Plaintiff needed assistance with opening mail and paying bills.  (Tr. 1440.)  He was able to grocery shop, but he did not do so efficiently.  (*Id.*)  He cooked but then lacked motivation to clean, eventually becoming overwhelmed with the mess in the kitchen.  (*Id.*)  Plaintiff was unsuccessful with scheduling and time management tools because he would get distracted, forget about them, and miss reminders.  (*Id.*)  Plaintiff's sensory processing issues were noted to impact all his life skills and his decreased executive functioning skills were noted to impact school/home/work.  (*Id.* at 1441.)

Plaintiff's difficulties with daily activities were also noted by his treating psychiatrist, Eric Wittrock, D.O.  Dr. Wittrock noted that plaintiff appeared 20 minutes late for his October 27, 2017, appointment, even though he was with his caseworker.  (Tr. 1253.)  Plaintiff appeared for his November 30, 2017, appointment with the assistance of his caseworker as well.  (Tr. 1256.)  Dr.

Wittrock recommended plaintiff's continued use of a caseworker for "social support" at his January, March and May 2018 appointments. (Tr. 1260, 1410, 1262.) Plaintiff appeared 15 minutes late for his May 16, 2018, appointment. (Tr. 1262.) At plaintiff's June 26, 2018, appointment Dr. Wittrock noted that plaintiff had difficulty bathing and keeping his house orderly, and that he tended to procrastinate chores and had difficulty with focus and motivation. (Tr. 1263.) Plaintiff's cognitive behavior therapy was of limited use as plaintiff continued to forget to do basic daily activities. (*Id.*) Dr. Wittrock noted plaintiff's willingness to try occupational therapy and suggested plaintiff continue to receive social support services from his caseworker. (*Id.* at 1264.) In August of 2018, Dr. Wittrock noted that plaintiff had started occupational therapy and recommended continuation of social support services by his caseworker. (Tr. 1452.) Plaintiff's continued difficulties with focus and concentration, hygiene, and social interactions were noted by Dr. Wittrock in October, 2018. (Tr. 1463.) Continuation with case management services for social support was recommended by Dr. Wittrock throughout his treatment of plaintiff, which continued well beyond plaintiff's date last insured. (Tr. 1570, 1574-75, 1582, 1587, 1596, 1604, 1612, 1620, 1822, 1804.)

Plaintiff's need for extensive supportive services should have been considered by the ALJ in her disability determination as required by the

Regulations.[5]  Here, the ALJ substantially erred when she concluded that plaintiff lived independently and managed his daily activities simply because he lived alone.  "The nature of the medical condition and the nature of the life activities, including such considerations as independence, should be considered against the backdrop of whether such activities actually speak to claimant's ability to hold a job.  Participation in activities with family or activities at home and 'at your own pace' may not reflect an ability to perform at work."  *Nowling v. Colvin*, 813 F.3d 1110, 1121-22 (8th Cir. 2016) (citation modified).  As the Eighth Circuit Court of Appeals has recognized, when individuals with mental illness have their lives structured to minimize stress and reduce their signs and symptoms, they "may be much more impaired for work than their signs and symptoms would indicate." *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996) (citation modified).

Here, the evidence of record overwhelmingly demonstrates that, contrary to the ALJ's conclusions, plaintiff did not "live independently and accomplish his daily activities."  Instead, plaintiff rarely accomplished daily activities such as adequate hygiene, organization, appointment management and attendance, and home keeping without the regular intervention and assistance of caseworkers, his

---

[5] *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing of Impairments, 12.00(C)(3) (requiring ALJ to consider evidence of his daily functioning from case managers, social workers, and community support and outreach workers), 12.00(D)(3) (ALJ must consider the kinds, extent, and frequency of help and support claimant receives to determine daily functioning).

mother, and eventually an occupational therapist.  Even as late as September 17, 2020, after three years of supportive services from a caseworker and the addition of occupational therapy, plaintiff's caseworker still continued to assist plaintiff with organizing and home chores, scheduling his appointments, communicating with doctors, and developing social interaction skills.  (Tr. 1813.)   Both Nurse Whelan and Dr. Wittrock recognized plaintiff's ongoing need for supportive services and recommended such services be provided throughout their treatment of plaintiff.  Because the ALJ failed to consider the extent to which structured settings and supportive environments affected plaintiff's ability to function, her RFC determination is not supported by substantial evidence.[6]

D.    <u>Opinion Evidence</u>

Plaintiff next argues that the ALJ erred in her evaluation of the medical opinion evidence when fashioning his RFC.  Plaintiff contends that the ALJ substantially erred in her consideration of the medical evidence when fashioning his RFC because she failed to account for his off-task behavior and absenteeism.  The ALJ concluded that plaintiff could complete tasks in a timely manner at an

---

[6] Although a deficiency in opinion writing should ordinarily not form the basis for a remand to the Commissioner, to the extent the ALJ decided that plaintiff was not "mentally disabled" simply because he was "intelligent," she erred.  Disabling mental limitations take numerous forms, and a claimant need not have low intellectual functioning to qualify for benefits.

appropriate pace while ignoring or avoiding distractions and work a full work day without needing more than the standard breaks.  (Tr. 23.)

Because plaintiff filed his claim for benefits on October 11, 2016, the treating physician rule applies.  20 C.F.R. § 404.1527 (setting out standard for evaluating opinion evidence for claims filed before March 27, 2017).   That means "the opinion of a treating physician is accorded special deference under the social security regulations." *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000) (citation modified).  The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"  *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)).[7]  Although the ALJ cited the treating physician rule when describing her role in the assessment of medical evidence, she did not actually apply it.  Instead, she chose to discount the myriad of medical opinions documenting plaintiff's difficulties with concentration and attendance in favor of

---

[7] This standard differs from the one applied to claims filed after March 27, 2017, which permits an ALJ to weigh all opinion evidence, regardless of source, using the factors of supportability and consistency.  *See* 20 C.F.R. § 416.920c(a) (2017) (when evaluating claims filed March 27, 2017, or later, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources.").

an opinion given by a non-examining state agency consultant in November of 2016. In doing so, she substantially erred.

On November 23, 2023, Dr. Wittrock submitted an opinion in support of plaintiff's application for benefits as his treating psychiatrist. (Tr. 3626-27.) This opinion, although rendered outside plaintiff's last insured date, was considered by the ALJ as Dr. Wittrock expressly states that "the limitations described in this letter have been present since at least April 2017, unless otherwise noted." (Tr. 3626.) Dr. Wittrock states that plaintiff "struggles across multiple areas of occupational functioning" and that his conditions impact his ability to "concentrate, persist and maintain pace" and "reliably show-up to and stay at work." (*Id.*) Dr. Wittrock notes that plaintiff "struggles to perform even simple one-to-step instructions without extensive clarifications" despite "a high estimated IQ." (*Id.*) He opines: "In my opinion, [plaintiff] would require frequent supportive, nonconfrontational supervision – to repeat instructions, remind him of tasks, help him prioritize his work, redirect him to tasks and encourage him to complete tasks." (Tr. 3626-27.) Dr. Wittrock believes that plaintiff "would require a quiet work environment away from others and free from distraction" due to his sensory processing difficulties, and that he "would require the ability to take frequent breaks of at least 10 minutes likely to occur each working hour." (Tr. 3627.) In addition, Dr. Wittrock states that plaintiff "would need to leave his

workstation and go to a distraction-reduced environment for lunch which would take more than 30 minutes." (*Id.*) Dr. Wittrock notes that plaintiff continues to struggle with activities of daily living despite participating in psychiatric treatment and various rounds and types of therapies and taking medications. (*Id.*) He concludes: "Thus, it is my opinion that even in a work-setting free of distraction, with a supportive supervisor, and where he was only expected to perform simple, routine, and repetitive tasks, plaintiff would miss multiple days of work per month due to symptoms from his mental health conditions." (*Id.*)

Dr. Wittrock also submitted mental medical source statements in support of plaintiff's application of benefits in 2018 and 2020. (Tr. 1375-78, 1691-94.) In 2018, Dr. Wittrock believed that plaintiff could focus and persist on simple tasks for 15 minutes before needing redirection or supervision. (Tr. 1377.) By 2020, that number had increased to one hour. (Tr. 1693.) In 2018, Dr. Wittrock believed that plaintiff's pace of production would be more than 50% percent below average, but by 2020 that estimate was 21-50% below average. (Tr. 1377, 1693.) However, in both statements Dr. Wittrock stated that plaintiff would be expected to miss work three times per month or more due to his symptoms and that he would be tardy or need to leave work early three times per month or more for the same reason. (Tr. 1377, 1693.)

The ALJ afforded the opinions of Dr. Wittrock – and all the other treating

medical sources – "little weight." (Tr. 30.) According to the ALJ, there was not "sufficient support" in the record for these "extreme limitations" because they were not consistent with plaintiff's normal mental status examinations, his "stable and beneficial treatment regimen," and plaintiff's activities of daily living. (*Id.*) In addition, the ALJ believed that Dr. Wittrock's mental source statements were "not internally consistent" regarding plaintiff's concentration abilities. (Tr. 31.)

In contrast, the ALJ concluded that the opinion from Gretchen Brandhorst, Psy.D., a non-examining state agency consultant who reviewed plaintiff's records upon initial consideration and rendered an opinion in November of 2016, was entitled to "significant weight." (Tr. 27.) Dr. Brandhorst concluded that plaintiff could maintain the concentration, persistence, and pace necessary to understand and remember simple tasks and instructions. (Tr. 27.) The ALJ decided that Dr. Brandhorst's opinion was consistent with evidence of plaintiff's intelligence, concentration, and normal mental status examinations. (*Id.*)

In this case, the ALJ improperly discounted all the evidence from plaintiff's treating medical sources in favor of an opinion rendered by a non-examining consultant whose opinion was given in November of 2016. In doing so, she cherry-picked the substantial evidence of the record as a whole to impermissibly "play doctor." *Pate–Fires v. Astrue*, 564 F.3d 935, 946–47 (8th Cir. 1995) (ALJ may not "play doctor"). "Although a treating physician's opinion is entitled to

18

great weight, it does not automatically control or obviate the need to evaluate the record as a whole."  *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir. 2001).  While an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions," *Prosch,* 201 F.3d at 1013 (citation modified), she may not substitute her own opinions for the opinions of medical professionals.  *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990).  Nor may she bolster her attempt to do by relying on the opinion of a non-examining consultant.  "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole."  *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003).  This is especially true here, where the non-examining consultant only reviewed plaintiff's medical records through November of 2016, but plaintiff's significant mental symptoms continued well past that date and included substantial support services from caseworkers, various therapists, and regular psychiatric care and treatment from Dr. Wittrock.

Contrary to the ALJ's decision, Dr. Wittrock's opinions, and the severity of plaintiff's limitations, are not inconsistent with normal mental status examinations. Plaintiff was admitted to IOP despite normal mental status examination in

December of 2015, and he continued to meet the criteria through at least April of 2016 despite continued normal mental status examinations. Upon treatment with Dr. Wittrock, plaintiff consistently presented as alert and oriented with normal speech, thought processes, and content, fair judgment and insight, and normal affect. (Tr. 1249, 1251, 1253, 1257, 1259, 1261, 1263.) Yet during this same time plaintiff also required regular sessions with Dr. Wittrock along with counseling, therapies, at least three medications for anxiety and mood regulation,[8] and continued social support from a case manager and his mother. (*Id.*) Plaintiff's normal status examinations did not preclude his treating psychiatrist (or his other treating medical sources) from diagnosing plaintiff with, and treating him for, disabling anxiety, hyperactivity, and autism.[9] Dr. Wittrock's opinions are well-supported by his extensive treatment notes. (Tr. 1247-79, 1394-1476, 1567-1642, 1769-1849, 2108-2119.) Given Dr. Wittrock's specialized field of practice and the length and nature of his treatment history with plaintiff, Dr. Wittrock was in the best position to render an opinion as to plaintiff's limitations, and it was error for the ALJ to substitute her own judgment for his and conclude that plaintiff was not

---

[8] Plaintiff's difficulties with side effects from psychotropic medications are well-documented and led Dr. Wittrock to refer plaintiff for pharmacogenetic testing. (Tr. 1690.) Plaintiff was ultimately diagnosed with SSRI sensitivity and mild serotonin syndrome and placed on an "unorthodox" medication regimen as a result. (Tr. 67, 1806.) The ALJ recognized plaintiff's difficulties maintaining a standardized psychotropic medication protocol. (Tr. 26.)

[9] And as previously discussed, during this same time period plaintiff continued to require the regular services of a caseworker as he struggled with all activities of daily living.

disabled because his symptoms were co-extensive with normal mental status examinations.

The same is true with respect to the ALJ's repeated references to plaintiff's intelligence as a reason to conclude he is not disabled. As acknowledged by Dr. Wittrock, plaintiff's substantial limitations persist despite "a high estimated IQ." (Tr. 3626.) Low intellectual functioning is not a limitation claimed by plaintiff, and he is not required to demonstrate such to obtain benefits.

The ALJ's erroneous assessment of plaintiff's daily activities is discussed above and, for the same reasons, does not provide an adequate basis upon which to disregard the opinion of plaintiff's treating psychiatrist. To the extent the ALJ claims that "watching shows on Netflix or browsing social media" demonstrates that plaintiff can sufficiently persist on-task without redirection or supervision to maintain gainful employment, her finding (Tr. 31) lacks support in the record and is not entitled to deference. *See Nowling*, 813 F.3d at 1121-22 ("Participation in activities with family or activities at home and 'at your own pace' may not reflect an ability to perform at work."). The record overwhelmingly demonstrates the difficulties plaintiff experiences with focus and task completion, and Dr. Wittrock's opinion is not undermined simply because plaintiff watches television or scrolls through social media.

There is also no support in the record for the ALJ's assessment that Dr.

21

Wittrock's opinion is internally inconsistent.  In her decision, the ALJ cites the two

mental medical source statements provided by Dr. Wittrock in 2018 and 2020 as

evidence of inconsistency.  (Tr. 31.)  Yet these statements are not inconsistent at all

and instead demonstrate that plaintiff had made some modest improvements in the

areas of focus and task completion over a two-year period of regular

psychotherapy, occupational therapy, medication management, and supportive

services.  But as opined by Dr. Wittrock in his 2023 letter, despite some

improvement plaintiff still struggles with occupational functioning which impacts

his ability to concentrate, persist, and maintain pace, and reliably show-up to and

stay at work.  (Tr. 3626.)

Plaintiff's other treating medical sources[10] also rendered opinions consistent

with Dr. Wittrock's.  On November 29, 2018, therapist Patrick Cruitt, M.A., who

worked with plaintiff from August of 2016 through May of 2020 in exposure

therapy, opined that plaintiff could focus and persist on simple tasks for 30 minutes

before needing task redirection, his pace of production would be 21-50% below

average, and he would be absent from work or need to leave early more than three

times a month or more due to his symptoms.  (Tr. 1500.)  Mr. Cruitt's observations

included the note that his responses were based upon working with plaintiff in

---

[10] The ALJ considered the opinions of Wittrock, Cruitt, Greenlee, and Arndt as medical source
opinions.  (Tr. 28-31.)

therapy, "which is a different context from work." (*Id.*)  By November 25, 2019, Mr. Cruitt noted that plaintiff rated his social anxiety as "slightly to moderately less than the beginning of his treatment," indicating that his symptoms had improved.  (Tr. 1566.)  Like Dr. Wittrock, Mr. Cruitt believed that plaintiff had slightly improved his ability to focus and persist on simple tasks without additional supervision, but plaintiff could only do so for 90 minutes.  (Tr. 1565.)  And his overall pace of production was still 11-24% below average.  (*Id.*)  Mr. Cruitt believed that plaintiff's symptoms would still result in him being absent, late, or needing to leave work early once a month.  (*Id.*)

Plaintiff's case manager, Ian Arndt, completed a mental medical source statement in March of 2020, in which he believed that plaintiff could focus on simple tasks for one hour without needing additional redirection or supervision and that his pace of production would be 11-24% below average.  (Tr. 1645.)  Mr. Arndt expected plaintiff to miss work twice a month because of his symptoms and that he would be tardy or need to leave work early three times a month or more for the same reason.  (Tr. 1645.)

Alison Greenlee, MSW, LCSW, SEP, submitted a letter in support of plaintiff's application of benefits on October 25, 2023.[11]  (Tr. 3082.)  Ms. Greenlee

---

[11] This evidence was considered by the ALJ although dated beyond the date last insured.  (Tr. 31.)

states that she has seen plaintiff for weekly individual psychotherapy sessions since June of 2021.  (*Id.*)  She notes that plaintiff has made significant progress during that time period with his mood symptoms and anxiety, but he continues to struggle with holding attention on tasks, following through with activities of daily living, and organization skills.  (*Id.*)  Plaintiff remains "easily distractable" and avoids tasks that require sustained effort.  (*Id.*)  He continues to rely on care providers to complete and maintain activities of daily living.  (*Id.*)

The record also contains an occupational therapy evaluation summary from Bethany Arkills, plaintiff's occupational therapist, dated July 17, 2023.[12]  (Tr. 2743-56.)  After a comprehensive 2.5 hour evaluation, during which Ms. Arkills administered numerous skills tests to plaintiff, completed an executive functioning questionnaire with plaintiff, and reviewed an assessment of plaintiff's individual living skills completed by plaintiff's mother, Ms. Arkills concluded as follows: plaintiff demonstrates low registration to movement, touch, and auditory processing as demonstrated in part by becoming confused and distracted while working on a tasks and needing repetition of instructions.  (Tr. 2754.)  Plaintiff

---

[12] Although not explicitly cited by the ALJ, Ms. Arkills' evaluation was given to the ALJ and relied upon by plaintiff's counsel at the administrative hearing.  (Tr. 61.)  Plaintiff also testified about his therapy with Ms. Arkills.  (Tr. 65-66.)  Therefore, Ms. Arkills' evaluation is part of the administrative record and must be considered by this Court to determine if there is substantial evidence supporting the ALJ's decision.  *See Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012) (court must examine all evidence in the record to determine if the record as a whole supports ALJ's decision); *Aubuchon v. Astrue*, 4:09CV465 DDN, 2010 WL 2870566, at *11 (E.D. Mo. Jul, 19, 2010) (same).

avoids visual and auditory processing by avoiding situations where unexpected things might happen.  (Tr. 2754-55.)  Plaintiff displays executive functioning difficulties with task initiation, organization, planning/prioritization, sustained attention, time management, and working memory.  (Tr. 2755.)  Ms. Arkills opines that plaintiff's processing and executive functioning difficulties impact his ability to maintain employment because they manifest in difficulties with personal appearance, hygiene, food management, housekeeping, transportation, job maintenance skills, and interpersonal skills.  (Tr. 2755.)  Ms. Arkills states that plaintiff's sensory processing and executive functioning deficits would impact his ability to meet a deadline, learn a new task or new way of doing a task, manage his time for work completion, maintain organization in his workflow, or focus and attend in a visual or auditory setting that is overwhelming to perform his job duties efficiently and accurately.  (Tr. 2755.)

At the administrative hearing, the VE testified that a person who needed redirection to task, especially more than once per day, was not able to work in the realm of competitive employment.  (Tr. 72.)  The VE also testified that anything more than 10 % off-task behavior would be "work preclusive."  (*Id.*)  Finally, the VE stated that more than 10-12 unscheduled absences per year and unscheduled breaks would not be tolerated in the workforce.  (*Id.*)

Thus all of plaintiff's treating sources agreed that plaintiff would need

frequent redirection to task by supervisors and that he could only perform at a

production pace well below what the VE testified would be tolerated in

competitive employment.   They also agreed that plaintiff's symptoms would cause

him to miss work, be late, leave early, or take frequent unscheduled breaks far

more than what the VE testified competitive employment would permit.   None of

plaintiff's treating sources opined otherwise.  Yet the ALJ discounted all of this

evidence in favor of one opinion rendered by non-examining consultant Dr.

Brandhorst who reviewed plaintiff's file in 2016 upon initial consideration.  (Tr.

263-65.)  Her opinion consists solely of one or two word responses on the

standardized mental residual functional capacity assessment form used by the

Commissioner and contains no narrative explanation or summary of the medical

evidence reviewed.  (*Id.*)  And it was given in 2016, well before plaintiff's

extensive treatment history with Dr. Wittrock, plaintiff's numerous therapies, and

the intervention of supportive services.  While not irrelevant solely for this reason,

it is not based on the extensive evidence underlying Dr. Wittrock's opinion and

cannot constitute substantial evidence supporting the RFC.[13]   *See, e.g., Fischer v.*

*Saul*, Case No. 2:19CV69 NCC, 2020 WL 5291934, at *8 (E.D. Mo. Sept. 4, 2020)

(state agency medical consultant cannot constitute substantial evidence in support

---

[13] The vast majority of plaintiff's medical evidence post-dates Dr. Brandhorst's review of the record.

of RFC); *Naumann v. Kijakazi*, 2022 WL 670134, at *8 (E.D. Mo. Mar. 7, 2022) (non-examining state agency consultant opinion is not substantial evidence, particularly where rendered without review of claimant's extensive medical records created thereafter).

For these reasons, the ALJ substantially erred in discounting the opinion of Dr. Wittrock and other treating medical sources in favor of a perfunctory opinion given by a non-examining consultant. The record does not provide a basis for rejecting the well-supported opinion of Dr. Wittrock, plaintiff's treating psychiatrist, as it offers a longitudinal perspective of plaintiff's condition and limitations based on years of treatment, plaintiff's success (or lack thereof) with medication therapy that he prescribed for him, and the results of therapy given and recommended by him. *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (opinion of treating physician accorded special deference under regulations and is "normally entitled to great weight."). "When a treating physician's well-supported assessment of work-related limitations is disregarded, an ALJ's RFC determination is not supported by substantial evidence in the record." *Norwood v. Saul*, 4:18CV1104 SNLJ, 2019 WL 4221524, at *5 (E.D. Mo. Sept. 5, 2019) (citation modified). This error requires reversal as the ALJ used her erroneous assessment of the medical evidence (along with her flawed analysis of plaintiff's daily activities) to craft an RFC not reflective of plaintiff's true limitations. As noted

above, the VE testified without qualification that someone with plaintiff's inability to stay on-task without constant redirection, need for unscheduled breaks, and absenteeism could not maintain competitive employment.  Had the ALJ properly evaluated the treating source opinions and relied on them instead of the consultant's opinion as required by the governing Regulation, she would have reached but one conclusion -- that plaintiff was disabled.

## Conclusion

In this case, the ALJ's erroneous assessment of plaintiff's limitations after *four* attempts to properly analyze plaintiff's application supports an award of benefits, rather than a routine remand for additional fact-finding.  Fact-finding would also be futile given that plaintiff's last insured status expired four years ago. Any additional evidence of plaintiff's limitations gathered now would almost certainly be considered too remote in time to assist the ALJ in the determination of plaintiff's request for benefits during the relevant time period.

There is no reason to further prolong this case.  I have carefully reviewed all the evidence of record.  For the reasons set out in this memorandum, the clear weight of the evidence fully supports a determination that plaintiff was disabled during the relevant time period within the meaning of the Social Security Act. Because the record overwhelmingly supports a finding of disability, reversal and remand for an immediate award of benefits is appropriate.  *Pate-Fires*, 564 F.3d at

947; *Parsons*, 739 F.2d at 1341; *Lillard v. Berryhill*, 376 F. Supp. 3d 963, 988-89

(E.D. Mo. 2019).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**REVERSED** and this case is **REMANDED** to the Commissioner for calculation

and award of benefits with a disability onset date of August 21, 2015.

An appropriate Judgment is entered herewith.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 6th day of October, 2025.